[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 445 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 446 
John Crane, Inc. ("Crane"), and Owens-Corning Fiberglass Corporation ("OCF") seek this Court's affirmance of summary judgments entered against former seamen William Shaw, Henry Sheffield, and John Young (the "plaintiffs") and numerous owners and operators ("shipowners") of the ships on which the plaintiffs were employed. The claims of the plaintiffs against OCF were based on allegations of injury as a result of exposure to OCF's asbestos products, which, they contended, were aboard the ships on which they served. The shipowners sought indemnity or contribution from OCF and Crane, whose asbestos products, the plaintiffs say, were aboard ships on which the plaintiffs were employed. We affirm in part and reverse in part and remand.
 I. FACTUAL BACKGROUND
Shaw, Sheffield, and Young were merchant seamen with approximately 15, 22, and 8 years' experience at sea, respectively. Shaw's maritime service ended in 1982, Sheffield's in 1968, and Young's in 1960. Subsequently, all three seamen, alleging that they were suffering from asbestosis, a progressive pulmonary disease allegedly caused by the inhalation of airborne asbestos fibers, filed complaints in Mobile County Circuit Court on February 17, 1987, June 16, 1987, and June 11, 1987, respectively, against their former employers, the owners and operators of the ships on which they had served.
The original complaints alleged causes of action for negligence pursuant to the Jones Act, 46 U.S.C.App. § 688, and for unseaworthiness, which allegedly resulted from the presence of asbestos fibers aboard the ships. The shipowners, seeking indemnity and contribution under principles of maritime law, impleaded 27 manufacturers whose asbestos-containing products could have been aboard the ships on which the plaintiffs served. All three plaintiffs eventually amended their complaints to allege, under general maritime law, causes of action for strict product liability, failure to warn, and various other product liability theories, directly against the same 27 manufacturers.
Several of the manufacturers, including Crane and OCF, moved for summary judgments on the ground that there was insufficient evidence linking the plaintiffs' injuries to any particular manufacturer's product. On February 22, 1991, the trial court granted the motions of Crane and OCF and certified its summary judgments as final, pursuant to Ala.R.Civ.P. 54(b). The issues presented on appeal from those summary judgments are (1) whether maritime law controls the claims of the plaintiffs and shipowners against OCF and Crane, and (2) *Page 447 
whether evidence of a causal connection between products manufactured by Crane and OCF was sufficiently established in each plaintiff's case to preclude summary judgment.
 II. APPLICABLE LAW
Although the claims of the plaintiffs against the shipowners for Jones Act negligence and unseaworthiness are not at issue in this appeal, it is undisputed that federal law governs those claims.[1] It follows, therefore, that federal maritime law also governs the indemnity claims of the shipowners against OCF and Crane. Vaughn v. Farrell Lines, Inc., 937 F.2d 953, 956 (4th Cir. 1991) (where the "underlying tort claims from which the indemnity claim is derived . . . are maritime tort claims," the " 'indemnity claim arising therefrom is similarly a maritime claim' "); White v. Johns-Manville Corp., 662 F.2d 243, 247
(4th Cir. 1981); Swogger v. Waterman S.S. Corp., 151 A.D.2d 100,546 N.Y.S.2d 80 (1989); T. Schoenbaum, Admiralty and MaritimeLaw § 4-15, at 146 (1987) ("There is admiralty jurisdiction over controversies involving contribution and indemnification if jurisdiction exists over the underlying primary cause of action").
In our view, the underlying claims in this suit are the plaintiffs' claims against the shipowners alleging Jones Act negligence and unseaworthiness; therefore, the above-cited authorities fully answer the question regarding the applicable law. However, because the strenuous arguments of OCF and Crane focus principally on the product liability claims involved in this suit, as if those claims formed the "underlying primary cause of action," we will, out of deference to OCF and Crane, inquire whether the product liability claims of the plaintiffs against OCF and Crane, standing alone, would be subject to admiralty jurisdiction.[2]
OCF contends that maritime law does not apply to the plaintiffs' product liability claims because, it insists, those claims lack the necessary relationship or "nexus" to "traditional maritime activity" to invoke the admiralty jurisdiction of the federal courts. Brief ofDefendant-Appellee, at 37.[3] For this proposition, OCF citesCochran v. E.I. duPont de Nemours, 933 F.2d 1533 (11th Cir. 1991), cert. denied, Cochran v. American Abrasive MetalsCo., ___ U.S. ___, 112 S.Ct. 881, 116 L.Ed.2d 785 (1992).
In Cochran, a panel of the Court of Appeals for the Eleventh Circuit held that an ex-Navy sailor's product liability claims against the manufacturers of asbestos products to which he was allegedly exposed while aboard an aircraft carrier did not invoke admiralty jurisdiction. Cochran, 933 F.2d at 1535. The court noted that the plaintiff's exposure to asbestos allegedly occurred in connection with his duties in maintaining the deck "while the ship was docked in navigable waters . . . and while the ship was at sea." Id. at 1538. Consequently, it concluded, the sailor's claims "clearly satisfie[d]" the traditional test for the application of maritime law, which turned on the "locality" of the injury. Id.
Having reached this determination, however, the court subjected the plaintiff's claims to further analysis to determine whether they demonstrated a "significant relationship to traditional maritime activity." Cochran, 933 F.2d at 1538. Specifically, the court considered the claims in relation to "the functions and roles of the parties"; "the types of vehicle and instrumentalities involved"; "the causation and type of injury"; and "the traditional concepts *Page 448 
of the role of admiralty law." Id. at 525; Cochran,933 F.2d at 1538-39. Placing special emphasis on the fourth factor, theCochran court ultimately found no admiralty jurisdiction.
The four-part test employed by Cochran evolved in response toExecutive Jet Aviation, Inc. v. City of Cleveland,409 U.S. 249, 253, 93 S.Ct. 493, 497, 34 L.Ed.2d 454 (1972). Our own analysis of Executive Jet and, in particular, the more recent case of East River S.S. Corp. v. Transamerica Delaval, Inc.,476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), convinces us that the application of the nexus test to the case subjudice is inappropriate.
Traditionally, as Cochran correctly pointed out, whether the exercise of admiralty jurisdiction was proper in any case alleging personal injury depended on the locality of the tort. In such cases, admiralty jurisdiction extended only to torts that were "committed on the high seas, or on waters within the ebb and flow of the tide." Thomas v. Lane, 23 Fed.Cas. 418, 444 (C.C.Me.1813) (Story, J., on circuit). Subsequent developments, however, both legal and technological, significantly increased the potential scope of admiralty jurisdiction where the existence vel non of jurisdiction depended solely on the situs of the tort.
The locality from which admiralty jurisdiction was deemed to arise was eventually "expanded to include not only tidewaters, but all navigable waters, including lakes and rivers."Executive Jet Aviation, Inc. v. City of Cleveland,409 U.S. 249, 253, 93 S.Ct. 493, 497, 34 L.Ed.2d 454 (1972) (citing ThePropeller Genesse Chief v. Fitzhugh, 12 How. 443, 13 L.Ed. 1058
(1851)). Other expansions of the potential for the exercise of admiralty jurisdiction include (1) the "application of the Jones Act . . . to injuries to a seaman on land, because of the seaman's connection with maritime commerce," Executive Jet,409 U.S. at 259, 93 S.Ct. at 500 (citing O'Donnell v. Great LakesDredge Dock Co., 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596
(1943)), (2) the extension of the "doctrine of unseaworthiness . . . to permit a seaman or a longshoreman to recover from a ship owner for injuries sustained wholly on land, so long as those injuries were caused by defects in the ship or its gear,"id. at 260, 93 S.Ct. at 500 (citing Gutierrez v. Waterman S.S.Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963)), (3) the extension of admiralty jurisdiction through Congressional action in 1948 to "include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land," id. (citing the Extension of Admiralty Jurisdiction Act, 46 U.S.C. § 740), and (4) the development of aviation, with the attendant potential for mishaps during overflights of navigable water and the consequent prospect of involvement with maritime law. One such mishap provided the backdrop against which the United States Supreme Court announced a rule designed to refocus jurisdictional analysis on torts exhibiting a significant "relationship to maritime service, commerce, or navigation." Executive Jet,409 U.S. at 259, 93 S.Ct. at 500.
In Executive Jet, a chartered airplane on its way to Portland, Maine, from Cleveland, Ohio, flushed a flock of birds from the runway during takeoff. Some of the birds were ingested into the plane's engines, causing an immediate loss of power. The aircraft descended back toward the runway, "struck a portion of the airport perimeter fence . . . and then settled in Lake Erie just off the end of the runway and less than one-fifth of a statute mile offshore." Id. at 250,93 S.Ct. at 496. The owners of the aircraft sought to invoke admiralty jurisdiction in a suit against the City of Cleveland and others for negligence in failing to clear the runway of birds. Id. at 251, 93 S.Ct. at 496. Reasoning that because the incident giving rise to the claims at issue was "only fortuitously and incidentally connected to navigable waters" and demonstrated "no relationship to traditional maritime activity," the Court held that there was "no admiralty jurisdiction over aviation tort claims arising from flights by land-based aircraft between points within the continental *Page 449 
United States." Id. at 273-74, 93 S.Ct. at 507.[4] Subsequently, lower courts developed analyses, such as the four-part test employed in Cochran, designed to ensure a sufficient relationship between the claims and traditional maritime activity.
Significantly, however, Executive Jet left open the "question whether a maritime nexus also must be established when a tort occurs on the high seas." East River S.S. Corp. v. TransamericaDelaval, Inc., 476 U.S. 858, 864, 106 S.Ct. 2295, 2298,90 L.Ed.2d 865 (1986) (emphasis added). Moreover, its historical analysis implied that in such traditional maritime settings, the sophisticated analyses that have evolved in response to the less traditional situations are unwarranted. Despite the " 'perverse fascination in the occasion' " nontraditional situations " 'afford for elaborate casuistry, . . . the main business of the [admiralty] court involves claims for cargo damage, collision, seamen's injuries and the like — all welland comfortably within the circle, and far from the penumbra.' " Executive Jet, 409 U.S. at 254-55, 93 S.Ct. at 497-98
(emphasis added) (quoting G. Gilmore C. Black, The Law of Admiralty 24 n. 88 (1957)).
East River S.S. Corp. v. Transamerica Delaval, Inc.,476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), provided the Court an opportunity to address the rule of Executive Jet within a traditional maritime setting. In East River, the charterers of four oil-transporting supertankers sued the manufacturer of the vessels' turbines on various theories of product liability. The claims sought recovery for damage to the turbines as a result of malfunctions of the turbines themselves while the vessels were on the high seas. As a threshold matter, the Court determined that the claims were cognizable in admiralty. Id. at 863, 106 S.Ct. at 2298. More specifically, the Court stated that "[t]he claims satisf[ied] the traditional 'locality' requirement — that the wrong must have occurred on the high seas or navigable waters." Id. at 864, 106 S.Ct. at 2298
(citing The Plymouth, 3 Wall. 20, 35-36, 18 L.Ed. 125 (1865)). The Court deemed it unnecessary to reach the question whetherExecutive Jet's locality "plus" requirement extended to torts occurring on the high seas, stating: "Were there such a requirement, it clearly was met here, for these ships were engaged in maritime commerce, a primary concern of admiralty law." Id. at 864, 106 S.Ct. at 2298.
For these same reasons, it is unnecessary to subject the claims involved in this case to an analysis such as the one employed by Cochran v. E.I. duPont de Nemours, 933 F.2d 1533
(11th Cir. 1991), cert denied, Cochran v. American AbrasiveMetals Co., ___ U.S. ___, 112 S.Ct. 881, 116 L.Ed.2d 785
(1992).[5] Shaw, Sheffield, and Young were crewmen of vessels engaged in maritime commerce. They have alleged injuries due to exposure to asbestos while serving their respective vessels on the high seas. Consequently, their product liability claims lie "comfortably within the circle," Executive Jet,409 U.S. at 254-55, 93 S.Ct. at 497-98, of traditional maritime activity. See also Robinson v. United States, 730 F. Supp. 551
(S.D.N.Y. 1990); Swogger v. Waterman S.S. Corp., 151 A.D.2d 100,546 N.Y.S.2d 80 (1989).
Because these claims would support the exercise of admiralty jurisdiction, the rights and liabilities of the parties must be decided by the application of maritime law, with a number of important consequences. For example, maritime law recognizes claims for indemnity and contribution, T. Schoenbaum,supra, at § 4-15; comparative negligence, and strict product liability under Restatement (Second) of Torts § 402A (1965).East River S.S. Corp. v. Transamerica Delaval, Inc.,476 U.S. 858, *Page 450 
866, 106 S.Ct. 2295, 2299, 90 L.Ed.2d 865 (1986); Swogger v.Waterman S.S. Corp., supra; T. Schoenbaum, Admiralty andMaritime Law § 4-4, at 129-30 (1987).
 III. PROOF OF CAUSATION
At the outset, we point out that although these three plaintiffs have outstanding Jones Act claims against their employers, the applicable standard of proof of causation in all these claims against nonemployer manufacturers is the standard of proof applicable under general principles of maritime law, not, as the shipowners seem to imply, under the standard of proof for Jones Act negligence. See Brief of Appellants, at 31.[6]
The principles of maritime law are "[d]rawn from state and federal sources" and represent an "amalgam of traditional common-law rules, modifications of those rules, and newly created rules." East River S.S. Corp. v. Transamerica Delaval,Inc., 476 U.S. 858, 864-65, 106 S.Ct. 2295, 2299,90 L.Ed.2d 865 (1986). In formulating the corpus of maritime law, "[a]dmiralty courts have felt free to cull what they considered the best principles from the decisions of various courts and from treatise and textwriters." Watz v. Zapata OffShore Co.,431 F.2d 100, 113 (5th Cir. 1970). Courts sitting in admiralty, therefore, apply "the general law of torts" when those general principles are consistent with admiralty's policies and purposes. Harrison v. Flota Mercante Grancolombiana, S.A.,577 F.2d 968, 977 (5th Cir. 1978); Spinks v. Chevron Oil Co.,507 F.2d 216, 222, 222 n. 8 (5th Cir. 1975), clarified on othergrounds, 546 F.2d 675 (5th Cir. 1977).
The general tort law to which the admiralty courts often look for the substantive standards of proof of causation is theRestatement (Second) of Torts § 431 (1965). See, e.g., Chavezv. Noble Drilling Corp., 567 F.2d 287 (5th Cir. 1978); Harrisonv. Flota Mercante Grancolombiana, S.A., 577 F.2d 968 (5th Cir. 1978); Spinks v. Chevron Oil Co., 507 F.2d 216 (5th Cir. 1975), clarified on other grounds, 546 F.2d 675 (5th Cir. 1977);Watz v. Zapata OffShore Co., 431 F.2d 100 (5th Cir. 1970);Anderson v. Whittaker Corp., 692 F. Supp. 734 (W.D.Mich. 1987),aff'd, 894 F.2d 804 (6th Cir. 1990).
Section 431 provides that "[t]he actor's negligent conduct is a legal cause of harm to another if . . . his conduct is asubstantial factor in bringing about the harm." (Emphasis added.) In order to prevail, the plaintiff "must make it appear that it is [1] more likely than not that the conduct of the defendant was [2] a substantial factor in bringing about the harm." Restatement (Second) of Torts § 433B, comment a (emphasis added).[7]
 A. Claims Against OCF
(1) Sheffield and Young
Because "product identification is one element of causation,"Dillon v. Fibreboard Corp., 919 F.2d 1488, 1491 n. 4 (10th Cir. 1990), the "threshold requirement of any products liability action is identification of the injury-causing product and its manufacturer." Marshall v. Celotex Corp., 651 F. Supp. 389, 393
(E.D.Mich. 1987); see also Menne v. Celotex Corp.,861 F.2d 1453, 1456 (10th Cir. 1989). Although the plaintiff may satisfy this threshold requirement through circumstantial as well as direct evidence, under maritime law he "must make it appear that it is more likely than not" that the asbestos product manufactured by the defendant "was a substantial factor" in producing his injury. Restatement (Second) of Torts § 433B, comment (a) (emphasis added). "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation and conjecture, or the probabilities *Page 451 are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." Id. (Emphasis added.) Applying these standards to the evidence presented by Sheffield, Young, and the shipowners, in their attempts to link an asbestos product of OCF to the alleged injuries, we conclude that the evidence falls short of the threshold requirement for product identification.
In these maritime claims, the parties bearing the burden of proof on the issue of causation must, at a minimum, demonstrate that an asbestos product manufactured by OCF was aboard a ship on which each plaintiff served at the times relevant to that service.[8] Menne v. Celotex Corp., 861 F.2d 1453, 1461-62 (10th Cir. 1989) (citing Lohrmann v. Pittsburgh Corning Corp.,782 F.2d 1156 (4th Cir. 1986), and Blackston v. Shook FletcherInsulation Co., 764 F.2d 1480 (11th Cir. 1985)). The plaintiffs and shipowners attempt to satisfy this requirement with testimony that "Kaylo," an asbestos-containing insulation material manufactured by OCF in block form and tubular sections, was listed in a publication entitled "Qualified Products List of Products Qualified Under Military Specification" ("Qualified Products List"). The Qualified Products List refers to a number of products that had been tested by the United States Coast Guard and similar entities and had been "approved" for use on vessels, the construction of which was supervised and subsidized by the Maritime Administration. See Deposition of Lucien Castro, at 29-30;Deposition of John Boylston ("Boylston"), at 75.
The plaintiffs and shipowners attempt to bolster this evidence with testimony that vessels on which the plaintiffs served were built according to Government specifications. They insist that this evidence, when considered in conjunction with the fact that the Qualified Products List included Kaylo, creates a reasonable inference that Kaylo was incorporated into at least some of the vessels on which the plaintiffs served. We disagree.
Although the Qualified Products List includes a reference to Kaylo pipe insulation, it also approves for use in ship construction approximately 16 products manufactured by various other companies. In this connection, John Boylston, a naval architect, testified:
 "Q. Put another way, would it be fair to say that the equipment and material list is simply a shopping catalog, if you will, out of which a purchaser might order Brand A or Brand B or Brand C and so forth?
 "A. Well, he wouldn't order from it. It would just simply tell him what company he can go to for an approved product.
 "Q. I've got you. I guess the real point that I am trying to get clear in my mind, Mr. Boylston, is simply being included on one of these annual editions of the equipment and material list does not mean, does it, that your product was in fact, used on a particular vessel?
"A. No, it does not.
 "Q. It simply means that if a given naval architect or a given shipyard or a given vessel operator wanted to use your product, that it was approved; is that a fair statement?
 "A. That is correct. In fact, you will note that some manufacturers only have particular products listed and not certainly their whole line — only things that are directly applicable."
Boylston, at 78-79. (Emphasis added.)
Proof that Kaylo was approved for use in maritime construction, without more, falls considerably short of the proof needed to create a reasonable inference that it was, in fact, initially installed on any particular vessel. Such evidence creates nothing more than a "mere possibility" that Kaylo was on board a particular vessel, and, consequently, that it was a cause-in-fact of the alleged injuries. Under maritime *Page 452 
law, the requisite proof of causation is not satisfied "when the matter remains one of pure speculation and conjecture, or the probabilities are at best evenly balanced." SeeRestatement (Second) of Torts § 433B, comment a.
Indeed, to impose liability on the basis of an inference as attenuated as that suggested here could render every manufacturer whose product appears on the Qualified Products List responsible not only for harm caused by its own product, but also jointly and severally liable for injury caused by every other manufacturer whose product is on the list.[9]
Such an innovative approach to product identification is particularly problematic in the context of asbestos litigation, in view of the fact that asbestos products do not exhibit equal propensities for the release of noxious fibers. The relative toxicity of each product depends on a number of factors, including the "physical properties of the product . . ., the percentage of asbestos used in the product, the form of the product and the amount of dust it generates," as well as the "geographical origin of the mineral" itself. Leng v. CelotexCorp., 196 Ill. App.3d 647, 143 Ill.Dec. 533, 535-36,554 N.E.2d 468, 470-71 (1990), appeal denied, 132 Ill.2d 546, 144 Ill.Dec. 258, 555 N.E.2d 377 (1990). Obviously, the "greater the product's tendency to produce airborne fibers, the greater the likelihood that the fibers will be ingested and produce disease." 196 Ill. App. 3d at 651, 143 Ill. Dec. at 536,554 N.E.2d at 471. See also Marshall v. Celotex Corp., 651 F. Supp. 389
(E.D.Mich. 1987); Lockwood v. AC S, Inc., 109 Wn.2d 235,744 P.2d 605 (1987).
None of the cases on which the plaintiffs and shipowners rely has relieved a plaintiff of his burden of product identification to the extent that the plaintiffs and shipowners urge of this Court. In fact, much of the time they have expended and many of the cases they have cited in their briefs and arguments before us have been directed to the issue whether "evidence that a particular product was present at the plaintiff's job site allows the factfinder reasonably to infer that the plaintiff was injuriously exposed to that product."Supplemental Brief of Plaintiffs-Appellants, at 2. (Emphasis added.) However, authority addressing the quantum of evidence necessary to establish a triable issue of substantial exposure to a product — clearly identified — is inapposite to the threshold issue with which we are now concerned, that is, whether the evidence demonstrates to a reasonable probability that OCF's products were aboard any of the ships on which Sheffield and Young served.
For example, In Jackson v. Johns-Manville Sales Corp.,727 F.2d 506 (5th Cir. 1984), the issue, unlike that presented here, was one of sufficiency of evidence of exposure rather than one of product identification. There, it was established that "Raybestos-Manhattan products were ordered for use on at least seven to ten of the approximately sixty-nine hulls on which the plaintiff worked during his career," and that "Johns-Manville products were ordered for use on thirty or more of the hulls." Id. at 523. (Emphasis added.) Unlike the evidence in the present case, which consists of a list of products that were "approved" for general use in ship construction and repair, the plaintiff in Jackson was able to identify specific vessels on which specific products were ordered for use. There, the dispositive issue merely turned on whether a reasonable jury could have concluded that the plaintiff's exposure to the products of each of the identified manufacturers was a substantial factor in producing the injury.Id. See also Dillon v. Fibreboard Corp., 919 F.2d 1488, 1491
(10th Cir. 1990) (plaintiff produced the testimony of an insulator, "specifically identifying each of [the] defendants' products" at the plaintiff's job site); Johnson *Page 453 v. Celotex Corp., 899 F.2d 1281 (2d Cir.) (worker performing service on board the battleship Iowa simultaneously with the plaintiff specifically identified the defendants' products in use aboard that vessel), cert. denied, ___ U.S. ___,111 S.Ct. 297, 112 L.Ed.2d 250 (1990); Hoffman v. Allied Corp.,912 F.2d 1379 (11th Cir. 1990) (use of defendant's products was undisputed); Roehling v. National Gypsum Co. Gold Bond Bldg.Products, 786 F.2d 1225 (4th Cir. 1986) (plaintiff's coworkers had "distinct memories" of specific manufacturers); Martin v.American Petrofina, Inc., 779 F.2d 250 (5th Cir. 1985) (testimony of coworkers identified defendant's products at plaintiff's work site), modified on other grounds, 785 F.2d 543
(5th Cir. 1986); Ward v. Celotex Corp., 479 So.2d 294 (Fla. Dist. Ct. App. 1985) (plaintiff's coworker "definitely identified" defendant's product in use at plaintiff's work site). We are, therefore, unable to conclude that under maritime law, a seaman may satisfy his burden of product identification solely on the basis of a manufacturer's inclusion on the Qualified Products List.
The plaintiffs and shipowners also attempt to satisfy the product identification requirement by testimony that Kaylo wasin use at the various shipyards at which the plaintiffs' ships were constructed. This testimony, they contend, creates a "reasonable inference" that Kaylo was initially installed aboard some of the ships on which the plaintiffs served. This argument, however, suffers from many of the same infirmities as the one previously discussed.
The chances that Kaylo was installed on a particular ship at a particular construction site depended, as was demonstrated by various sources, on a number of variables. First, Kaylo was only one of a number of brands of pipe and boiler insulation that satisfied Government specifications for maritime installation. Deposition of Arthur Burris, Jr. ("Burris"), at 98, 303; Deposition of Burnett L. Bordelon, Sr. ("Bordelon"), at 11, 18-19; Deposition of Donald Andrew
("Andrew"), at 28.
Even more significantly, the use of any particular insulation product in the construction of a particular vessel was subject to various arbitrary forces such as price, Bordelon, at 19;Burris, at 305; availability, Bordelon, at 24-26; and the preferences of individual installation crews. Id., at 19-20. Thus, Mr. Bordelon, whose insulation crews preferred to use Kaylo whenever possible, could use it only 50 to 60 percent of the time. Id. at 26-27. In view of this evidence, proof that Kaylo was ordered for use at a shipyard, without more, falls short of that needed to create a reasonable inference that it was initially installed on any vessel served by Sheffield or Young.[10] Accord, Anjeski v. Keene Bldg. Development Co.,727 F. Supp. 331 (E.D.Mich. 1989), aff'd, Anjeski v. AC and S, Inc., 902 F.2d 32 (6th Cir. 1990).
In Anjeski, a witness specifically identified five asbestos products aboard a ship on which the plaintiff served as a boiler operator. A summary judgment for asbestos manufacturers was, nevertheless, deemed appropriate in view of testimony that "sailors sometimes rejected the supplies sent by the loading crew." Thus, there was "no evidence from which a jury could reasonably infer which of the five products identified were actually sent to the boiler room." Id. at 333.
Young and the shipowners also attempt to identify Kaylo on board vessels served by Young through the testimony of William Robinson. Robinson and Young were co-workers on two vessels — the Alcoa Cavalier and the Claiborne — for a total of 30 days of simultaneous service. Robinson's testimony fails, however, to identify the presence of Kaylo on board either of the two vessels. Although Robinson testified that he remembered seeing "one-foot squares" of OCF material during his career as a seaman (Deposition of William Robinson, at 180), he testified that he had never used the product. Also, his testimony *Page 454 
failed to identify the particular ships on which he saw the product. This absence of specification is significant in view of the fact that between 1944 and 1969 Robinson served on approximately 49 ships.
The shipowners and Young attempt to cure this deficiency in Robinson's testimony through the following interrogatory answer filed by Robinson:
 "13. [Interrogatory] With respect to each vessel on which you served, describe each asbestos product (by name, manufacturer and distributor, if possible) to which you claim you were exposed on that vessel and state: see attached.
 "13. [Answer] Asbestos cement, fibrous adhesive, fire retardant, asbestos cloth, block insulation, asbestos based felt, gaskets, insulation block, brake liners for winches. . . . I do remember the following companies: Celotex, Fibreboard, National Gypsum, Rock Wool, Owens Corning, John Crane Packing, Standard Asbestos, and Johns Manville."
(Emphasis added.) Robinson's answer could be construed as identifying OCF asbestos on every ship on which he served, including the Alcoa Cavalier and the Claiborne.
Accepting, arguendo, that consequence of Robinson's interrogatory answer, it comes too late. The trial court entered the summary judgment for OCF on February 22, 1991. The interrogatory answer had not, prior to that date, been presented to the Mobile Circuit Court as evidence in opposition to OCF's motion for a summary judgment. On June 14, 1991, Young and the shipowners, invoking Ala.R.App. P. 10(f), filed the answer with this Court, in a "Motion to Supplement the Record on Appeal," over the objection of OCF.
Rule 10(f) provides:
 "(f) Correction or modification of the record. If any difference arises as to whether the record truly discloses what occurred in the trial court, the difference shall be submitted to and settled by that court and the record made to conform to the truth. If anything material to either party is omitted from the record by error or accident or is misstated therein, the parties by stipulation, or the trial court either before or after the record is transmitted to the appellate court, or the appellate court, on proper suggestion or of its own initiative, may direct that the omission or misstatement be corrected, and if necessary that a supplemental record be certified and transmitted."
"The purpose of Rule 10(f) is to supply materials omitted from the record so that the record on appeal will accurately reflect what occurred in the trial court." Thomas v. State,550 So.2d 1057, 1062 (Ala.Crim.App.), aff'd, 550 So.2d 1067
(1989). The Rule "neither contemplates nor authorizes the introduction of documents, exhibits, evidence, or other matters which could or should have been, but were not, introduced at the original trial or hearing." Id. Cf. Sylvest v. Stowers,276 Ala. 695, 166 So.2d 423 (1964). This rule is in accord with the one limiting appellate review of a summary judgment to "the same factors considered by the trial court in initially ruling on the motion." Ex parte Bagby Elevator Electric Co.,383 So.2d 173, 176 (Ala. 1980).
In this case, the plaintiffs and shipowners have produced no evidence that Robinson's interrogatory answer, which was presented for the first time nearly four months after the judgment was entered, represented anything other than evidence that could have been, and should have been, presented to the trial judge before the ruling on the summary judgment motion. Consequently, whatever its evidentiary value, this additional document will not now serve as a basis on which to reverse the judgment of the trial court. We hold, therefore, that under maritime law, Sheffield, Young, and the shipowners have failed to satisfy the threshold requirement of product identification in their claims against OCF. As to those claims, the judgment of the trial court is affirmed.
(2) Shaw
William Shaw, through his deposition testimony, produced the following evidence: *Page 455 
 "Q. During the time that you were going to sea either in the early period when you were working for United Fruit or Waterman, or then in the later period of time after you were a fireman, during either of those periods can you identify any types of asbestos products that were in use aboard any of the ships?
 "A. [Shaw] Yes, it was blocks. That's the bricks that go in the boilers, and the cement and the covering that goes around the pipes.
". . . .
"Q. Any cement material type material?
 "A. I don't remember. For the bricks, yeah, it had to be, and the boilers, that's it."
Deposition of William Shaw, at 33 (emphasis added).
 "Q. Just to make sure I understand correctly, the only products that you ever worked with or worked around were the bricks, the cement and the cloth going around the pipes and the pipe coverings, is that correct?
"A. Yeah."
Id. at 117 (emphasis added).
"Q. What is Kaylo?
 "A. Kaylo is asbestos. They make the covering that goes around the pipes, at that time. I know and then they — when they worked on the boilers — I didn't work on the boilers, but I was close.
It was all over the ships. They didn't put it in lock-up like they do now and keep it hid from you, they put it where you could see it then, but you didn't know what it was. You still don't know what it was on the ship. They don't tell you when the ship leaves the shipyard.
"Q. When did you remember about Kaylo?
". . . .
"A. I always knew about Kaylo."
Id. at 150-51 (emphasis added).
In order to prevail on a motion for summary judgment, "the burden of proof is on the moving party to show the absence of any genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Kennedy Engine Co. v. Dog River Marina Boatworks, Inc.,432 So.2d 1214, 1215-16 (Ala. 1983). All reasonable inferences drawn from the evidence must be viewed in favor of the nonmovant.Braswell Wood Co. v. Fussell, 474 So.2d 67 (Ala. 1985). When viewed in this light, Shaw's testimony affords a reasonable inference of exposure to Kaylo. That a jury might decline to draw this inference is of no consequence.
Regarding the issue of exposure, L.T. Chapin, an insulation inspector and contractor, described the conditions typically created by the shipboard installation and repair of asbestos block and pipe covering. He testified that during the installation of Kaylo pipe covering and blocks, workmen were often required to saw the blocks and sections of pipe covering with a handsaw. Deposition of L.T. Chapin ("Chapin"), at 45, 54-55. He explained that the cutting process "created a lot of dust." Id. at 55. He further stated that "anytime a pipe insulator was working he was creating a dust," id. at 138, and that insulators were often scolded by other crafts working nearby for "creating a dust and a nuisance." Id. at 131.
The tendency of asbestos dust and fibers to "drift" for considerable distances, creating a secondary exposure hazard to bystanders and others not working directly with the material, has been generally recognized. See Hoffman v. Allied Corp.,912 F.2d 1379, 1381 (11th Cir. 1990) (evidence indicated that airborne asbestos fibers had entered window of plaintiff's work area from shipyard 300-400 feet distant); Lockwood v. AC S,Inc., 109 Wn.2d 235, 744 P.2d 605, 611 (1987) (expert testimony demonstrated that "asbestos dust could remain floating in the air once it was released," injuring "bystanders not directly working with asbestos"). This tendency renders seamen peculiarly vulnerable to airborne fibers because of the relatively confined quarters to which they are typically confined. *Page 456 
In reference to this diffusive tendency, naval architect John Boylston testified that asbestos particles released during boiler repair would be picked up by the ventilation and "immediately blown into the engine room." Deposition of JohnBoylston, at 222-23. Seaman Leonard Dykes testified that dust was picked up from the engine room and disseminated throughout the ship. More specifically, he stated:
 "Q. You mentioned . . . dust getting in the air and in the ventilation system. Where would this dust be coming from?
"A. Out of the engine room.
". . . .
 "Q. Are you talking about — you have just seen dust coming from the engine room of the vessels? Was this a common occurrence?
 "A. No, let me put it this way. You can have an air conditioner blowing in your room, your forecastle and this table can be clean. When you come back and wipe it off, you see? That is what I am referring to."
Deposition of Leonard Dykes, at 139. Shaw, himself, testified that asbestos fibers were distributed through the ventilation systems. Shaw at 145-47. Thus, a seaman could be exposed tovisible dust from the boilers and the engine rooms without going near those locations.
In considering the potentially harmful effects of secondary exposure to asbestos dust, such as that alleged here by Shaw, the Fifth Circuit Court of Appeals observed:
 "The medical testimony adduced at trial indicates that inhaling asbestos dust in industrial conditions, even with relatively light exposure, can produce the disease of asbestosis. . . . Furthermore, the effect of the disease may be cumulative since each exposure to asbestos dust can result in additional tissue changes. A worker's present condition is the biological product of many years of exposure to asbestos dust, with both past and recent exposures contributing to the overall effect."
Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076, 1083
(5th Cir. 1973) (footnote omitted), cert. denied, 419 U.S. 869,95 S.Ct. 127, 42 L.Ed.2d 107 (1974). The trial testimony reproduced by the Borel court is corroborated by the evidence produced in this case. The plaintiffs and shipowners presented the affidavit of Dr. Lorino, who stated:
 "It is my opinion, based on a reasonable degree of medical certainty, that there is no safe level of asbestos exposure and that any and all asbestos fibers are pathogenic. Exposure to asbestos for as little as one day can significantly contribute to, cause, and/or aggravate asbestos-related lung diseases. The injurious effect of ingesting asbestos fibers into the lungs is cumulative. By this I mean that each and every exposure to asbestos contributes in a causally significant and substantial manner to asbestos-related lung impairment: each and every exposure to asbestos results in an additional and separate injury."
(Emphasis added.)
Whether the airborne fibers from a particular asbestos product have been a "substantial factor" in producing a plaintiff's injury is ordinarily a question for the jury. SeeBorel v. Fibreboard Paper Products Corp., 493 F.2d 1076, 1094
(5th Cir. 1973). In this case, evidence that Shaw was "close" to those who worked with Kaylo insulation on pipes and boilers, coupled with expert testimony that "each and every exposure to asbestos contributes in a causally significant and substantial manner to asbestos-related lung impairment," creates a triable issue as to whether airborne asbestos fibers from OCF's product was a substantial factor in producing the disease from which Shaw claims to suffer. Consequently, the summary judgment was inappropriate as to the claims of Shaw and the shipowners against OCF based on Shaw's alleged exposure to OCF's insulation material. Therefore, the judgment of the trial court as to these claims is reversed and the cause is remanded.
On a related matter, we note that the plaintiffs and shipowners produced testimony *Page 457 
indicating that Shaw was also exposed to OCF's asbestos products while working at shipyards. Although OCF and Crane object to the evidence as irrelevant to Shaw's maritime claims, they have not framed their objections in the form of an issue, briefed the issue, or cited cases in support of their positions.
Given the lack of attention specifically directed to this issue by the parties, we decline to establish a rule to be followed in all such cases. In this case, however, where Shaw has produced evidence of exposure to OCF's asbestos products in a traditional maritime setting sufficient to overcome a motion for summary judgment, his shipyard exposure to OCF's products is also subject to maritime law. Cf. Vaughan v. Johns-ManvilleCorp., 662 F.2d 251 (4th Cir. 1981) (Widener, J., concurring).
 B. Claims Against Crane
(1) Shaw and Sheffield
The third-party claims of the shipowners against Crane for indemnity due to the alleged exposure of plaintiffs Shaw and Sheffield to Crane's asbestos products rest upon the theory that a number of ships on which Shaw and Sheffield served contained boilers manufactured by Foster-Wheeler.[11] These boilers, the shipping companies contend, incorporated a number of asbestos-containing component parts manufactured by Crane. In support of this theory, they filed Exhibit No. 32, which they designated "Typical Foster-Wheeler Design Notebook." (Emphasis added.) The exhibit consisted of a booklet prepared by Foster-Wheeler entitled Instruction Book Steam Generators46,000 DWT Tankers Built by Bethlehem Steel CompanyShipbuilding Division, Quincy, Massachusetts . . . for VictoryCarriers, Inc. Crane contends, inter alia, that none of the ships on which the plaintiffs served was owned or operated by Victory Carriers; therefore, it argues, the booklet is irrelevant. The defendants insist that the specifications and parts lists contained in the booklet are "typical" of those used by Foster-Wheeler in boilers that were incorporated into vessels built during the 1960's, including those on which the plaintiffs served. Assuming, arguendo, that such an inference is proper, the evidence fails to establish a causal connection to the injuries of Shaw and Sheffield.
The list of Crane products described in the booklet consists of a total of 18 "rings" substantially described as "braided asbestos, with monel wire insert around resilient dry asbestos core impregnated with graphite with inhibitor in core lubricated throughout and completely surfaced with antifrictional dry graphite lubricant." Of the 18 rings, 5 rings measure 1/4" in thickness by 1 1/4" in diameter, 9 rings measure 5/8" in thickness by 2 5/16" in diameter, and 4 rings measure 5/8" in thickness by 1 3/8" in diameter. The booklet's schematic diagram depicts the 13 largest rings encased inside a "stuffing box."
Even assuming that the Foster-Wheeler boilers on board the vessels on which the plaintiffs served did contain these components, the evidence fails to show how the plaintiffs could have been exposed to airborne asbestos fibers released by the rings. There was no evidence that any of the Foster-Wheeler boilers were ever disassembled or assembled during the periods in which the plaintiffs served aboard the vessels. There was no evidence that either of the plaintiffs had ever seen or handled the rings or knew of their existence. In the absence of any evidence of exposure to these relatively inauspicious component parts, it cannot be inferred that the rings were a factor in producing the plaintiffs' alleged injuries. Consequently, the judgment of the trial court is affirmed as to the claims of the defendants against Crane based on the alleged exposure of Shaw and Sheffield to its products.
(2) Young
The third-party claims of the defendants against Crane for indemnity due *Page 458 
to the alleged exposure of Young to Crane's asbestos products, however, stands on a different ground.[12] Mr. Young testified that during his career as a seaman, his duties included making gaskets to repair leaking valves. Deposition of John Young, at 15. Young also stated that some of the gasket material he used was manufactured by Crane and that dust from the gasket material was created by the cutting and sizing process. Id. at 17-18.
Crane concedes that it manufactured gasket material, some of which contained asbestos and some of which did not. Contending that there is no evidence that Young was exposed to itsasbestos-containing product, Crane cites the following portion of Young's deposition testimony:
 "Q. Now, I understand from listening to your testimony earlier that any packing or gasket material you used or were around, you don't know whether that had asbestos in it or not, do you?
"A. No, sir."
Deposition of John Young, at 120. Regarding the product identification issue, however, Young also testified as follows:
 "Q. Well, who told you that the gasket material, the packing material, and the cement was asbestos?
"A. Who told me that?
"Q. Yes, sir.
 "A. I have seen the identified pictures of it saying they are asbestos.
"Q. Was that here in your lawyer's office?
"A. Yes, sir.
 "Q. So you went through a picture book here in Mr. Pate's office?
"A. Yes, sir.
 "Q. And when you went through that picture book, you picked out what you remember seeing on the ship, is that correct?
"A. Right.
 "Q. And those three things that you remembered are what you testified about today, the John Crane, the Garlock and the Johns-Manville?
"A. That I could remember, yes, sir.
 "Q. And until you saw that picture book, you had no idea that any of that stuff was asbestos, did you?
 "A. I knew I had worked with it. I didn't know it was asbestos."
Id. at 50-51. Crane points out a number of apparent inconsistencies in Young's statements. Such observations, however, merely point out the existence of questions of fact regarding Young's identification of Crane's product, thus rendering the summary judgment inappropriate as to the indemnity claims of the defendants against Crane based on the exposure of John Young to Crane's gasket material. The judgment of the trial court as to these claims is, therefore, reversed, and the cause is remanded to the trial court for further proceedings.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and MADDOX, ALMON, HOUSTON, STEAGALL and INGRAM, JJ., concur.
[1] The Jones Act "extend[s] to seamen the rights accorded railway workers under the Federal Employers' Liability Act [FELA], 45 U.S.C. § 51-60." Spinks v. Chevron Oil Co.,507 F.2d 216, 224 (5th Cir. 1975), clarified on other grounds,546 F.2d 675 (5th Cir. 1977).
[2] Subject matter jurisdiction over admiralty and maritime cases is granted to the federal courts by U.S. Const. art. III, § 2, cl. 1, and by the Judiciary Act of 1789, 28 U.S.C. § 1333.
[3] It is also undisputed that if the federal courts could have exercised admiralty jurisdiction over the plaintiffs' product liability claims, those claims, although brought in state court, must be resolved pursuant to federal substantive law.Executive Jet Aviation, Inc. v. City of Cleveland,409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972).
[4] Although the Court expressly declined to decide "whether an aviation tort [could] ever, under any circumstances bear a sufficient relationship to traditional maritime activity to come within admiralty jurisdiction," it suggested that the crash of an aircraft during a transatlantic flight might "be thought to bear a significant relationship to traditional maritime activity because it would be performing a function traditionally performed by waterborne vessels." Id. at 271,93 S.Ct. at 505-06.
[5] The vessel involved in Cochran was a naval vessel, not a commercial ship involved in maritime commerce.
[6] "The rights available under the Jones Act, however, do not extend to suits against third parties who are not [the] plaintiff's employer." Tritt v. Atlantic Richfield Co.,709 F. Supp. 630, 632 (E.D.Pa. 1989) (citing Cosmopolitan Shipping Co.v. McAllister, 337 U.S. 783, 789-90, 69 S.Ct. 1317, 1321,93 L.Ed. 1692 (1949)).
[7] These standards of proof on the issue of causation are equally applicable in strict product liability claims. Restatement(Second) of Torts § 431, comment e.
[8] The plaintiffs concede that the exposure sites relevant to the claims in this case are the vessels on which the plaintiffs served. Supplemental Brief of Plaintiffs, at 7-8, 11-12.
[9] The approach suggested by the plaintiffs and shipowners approximates the alternative theory of causation articulated inSummers v. Tice, 33 Cal.2d 80, 199 P.2d 1 (1948), and "codified" in Restatement (Second) of Torts § 433 (1965). However, they have not expressly requested the application of the Summers doctrine, briefed the issues the doctrine raises in the context of asbestos litigation, or cited cases supporting its application. Therefore, we decline to address it further.
[10] There was no evidence such as that presented in O'Brien that the defendant's product was used interchangeably on all the vessels under construction at the shipyards at which the plaintiffs' ships were built during the times relevant to their construction.
[11] Shaw and Sheffield both voluntarily dismissed their claims against Crane prior to this appeal.
[12] Like Shaw and Sheffield, Young voluntarily dismissed his claims against Crane prior to this appeal.