**NORTH AMERICAN REFRACTORY COMPANY, Appellant,**

v.

**Martin EASTER, et al., Appellees.**

**No. 13–97–791–CV.**

Court of Appeals of Texas, Corpus Christi.

March 11, 1999.

Rehearing Overruled April 22, 1999.

Charles W. Schwartz, Marie R. Yeates, Catherine B. Smith, Penelope E. Nicholson, Vinson & Elkins, Houston, Debra S. Fitzgerald, Crouch & Hallett, Carolyn K. Noblin, Attorney at Law, Dallas, for Appellant.

Lisa Blue, Janice Pennington, Laurie J. Meggesin, Misty Ann Farris, Brent M. Rosenthal, Baron & Budd, Dallas, Alicia Butler, San Antonio, Edward A. Stapleton, III, Stapleton, Livesay & Cowen, Brownsville, for Appellees.

Before Chief Justice SEERDEN and Justices DORSEY and CHAVEZ.

## OPINION

CHAVEZ, Justice.

North American Refractories Company ("NARCO") appeals a jury verdict awarding damages to appellees for personal injuries and loss of consortium claims arising out of exposure to asbestos containing products manufactured by NARCO. In its first, second, and fifth issues, NARCO challenges the sufficiency of the evidence supporting causation, damages, and punitive damages. By its third, fourth, and sixth issues, NARCO contends the trial court erred in admitting and excluding certain evidence, consolidating the claim of a third plaintiff, and incorrectly apportioning settlement amounts as a credit to the total damage award. We affirm.

### Factual Background

Frederick Moss, Martin Easter, and both their spouses brought this lawsuit against twenty-four defendants, most of whom were manufacturers of asbestos-containing products. Among the named defendants was NARCO, a company that makes bricks and refractory products used for their heat resistant capabilities in high temperature settings such as furnaces and reactors. Moss and Easter, both retired engineers from Alabama, alleged that they contracted mesothelioma, a cancer of the lining of the chest wall, from their exposure to asbestos from defendants products. Easter also alleged suffering from asbestosis, a scarring of the lung tissue. Shortly after the lawsuit was filed, Moss died from his cancer and his suit was continued by representatives of his estate.

Most of the defendants settled, and by trial, NARCO was the only one remaining. Before trial, the court consolidated the asbestos-related claim of Sam Roberts. Roberts, like Moss and Easter, also alleged exposure from NARCO products while he worked as a boilermaker in Stevenson, Alabama. Roberts was diagnosed with asbestosis and asbestos-related pleural disease, a scarring of the tissue around the outside of the lung.

The case was tried under the substantive law of Alabama and was submitted to the jury on the theories of negligence and products liability under the Alabama Extended Manufacturers Liability Doctrine. The jury found that Moss, Easter, and Roberts sustained asbestos-related injuries and found NARCO liable under both theories.

### Proximate Cause Sufficiency of the Evidence

In its first issue, appellant argues that the evidence was both legally and factually insufficient to support the jury's finding that NARCO's asbestos-containing products were the proximate cause of Moss' and Easter's injuries.

When we review a legal sufficiency challenge, we consider only the evidence and inferences that would support a finding on the disputed point and disregard all evidence to the contrary. *Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex.1992). If the finding is supported by probative evidence, then we overrule the point and uphold the finding. *Southern States Transp., Inc. v. State*, 774 S.W.2d 639, 640 (Tex.1989). However, "[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

When confronting a factual insufficiency challenge, we consider all of the evidence presented. *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex.1993); *Cantu v. Butron*, 921 S.W.2d 344, 348 (Tex.App.—Corpus Christi 1996, writ denied). We overturn findings only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex.1996).

Under Alabama law, proof of proximate causation is an essential element for both products liability and negligence claims. *See Taylor v. General Motors Corp.*, 707 So.2d 198, 202 (Ala.1997) (products liability); *Rutley v. Country Skillet Poultry Co.*, 549 So.2d 82, 85 (Ala.1989) (negligence). The negligence of two or more persons may concur and combine to proximately cause injuries and damages. Causes concur and combine when they join together to produce a given result. If a party is negligent and such negligence concurs or combines with negligence of another party or a third person who is not a party to this lawsuit and the two combine to produce injury, the negligence of each will be deemed the proximate cause of the injury.[1] To establish liability under the Alabama Extended Manufacturer's Liability Doctrine (AEMLD), the plaintiff must show that he suffered injury or damages to himself or his property by one who sold a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer.[2] *Owens–Corning Fiberglas Corp. v. Martin*, 942 S.W.2d 712, 716 (Tex.App.—Dallas 1997, no writ) (citing *Peek v. Merit Mach. Co., Inc.*, 456 So.2d 1086, 1089 (Ala. 1984)).

The relevant Texas causation law is similar. A fundamental principle of traditional product liability law is that the plaintiffs must prove that the defendant supplied the product which caused their injury. *Gaulding v. Celotex Corp.*, 772 S.W.2d 66, 68 (Tex.1989); *Celotex Corp. v. Tate*, 797 S.W.2d 197, 203 (Tex.App.—Corpus Christi 1990, writ dism'd by agr.). If there is sufficient evidence presented by appellees showing that appellant supplied any of the asbestos to which appellees were exposed, then appellees have adequately met their burden of proof. *Tate*, 797 S.W.2d at 204.

Appellant claims the evidence does not support its liability because neither Moss nor Easter were able to personally identify any NARCO asbestos product, and testimony supplied by third-party witnesses to show Moss and Easter were exposed to NARCO's products amounted to no evidence.

Frederick Moss worked in a supervisory capacity as an engineer-inspector during his career with Alabama Power Company ("APC") from 1946 to 1951 and again from 1953 to 1988. In this time, he worked at seven different steam plants where he was exposed to several asbestos products manufactured by Owens–Corning, Owen–Illinois, Johns–Manville, Kaiser, Garlock, and Armstrong among others. Moss, who testified at trial by deposition, did not identify or claim exposure to any NARCO asbestos product. He did, however, introduce evidence of his exposure to NARCO products through the testimony of Wilburn Mathis.

Mathis worked forty-two years at the Gorgas Steam Plant while he was employed with APC. This was one of the seven steam plants that Moss had worked at during his career. As a laborer at Gorgas, Mathis was responsible for mixing NARCO castable products with water for repair work being done on the boilers. He recalled NARCO products being sprayed by other trades in areas around the plant. When the NARCO products were being mixed, he described the working conditions as "very dusty." Mathis recognized four asbestos-containing products as those that were used at Gorgas Steam Plant in the 1960s and 70s: NARCO Lite Castable, NARCO Lite Gunning Mix, NARCO Lite Insulat-

---

1. The court instructed the jury on proximate cause based on Alabama Pattern Jury Instruction 33.00. The instruction read:

 "PROXIMATE CAUSE" is that cause which in the natural and probable sequence of events, and without the intervention of any new or independent cause, produces the injury and without which such injury would not have occurred.

 The negligence of two or more persons may concur and combine to proximately cause injuries and damages. Causes "concur and combine" when they join together to produce a given result. If a party is negligent and such negligence concurs or combines with negligence of another party or a third person who is not a party to this lawsuit and the two combine to produce injury, the negligence of each will be deemed the proximate cause of the injury.

2. The AEMLD is a limited form of strict products liability law adopted by the Alabama Supreme Court in *Casrell v. Altec Industries*, 335 So.2d 128, 132–33 (Ala.1976), and *Atkins v. American Motors Corp.*, 335 So.2d 134, 141 (Ala.1976).

ing Refractory Concrete, and NARCO Aerogun.

He knew who Moss was and remembered him working around NARCO products as he supervised various trades at the Gorgas Steam Plant. Mathis witnessed workers who would mix the NARCO products when Moss was around and saw Moss breathing the dust from these products on a "good many occasions." He also saw Moss around the NARCO products when they were being sprayed.

Martin Easter worked as a construction/project engineer for U.S. Steel from 1941 to 1970. His duties included the supervision of various trades on construction projects at the blast furnaces, open hearths, and soaking pits. Easter recalled the severe dust conditions at the plant, especially when the blast furnaces were being repaired. He testified at trial that he regularly breathed the dust from refractory products, including NARCO products. He also added that he was frequently exposed to any products that were used for construction purposes at the plant. He could not identify the specific name of any NARCO product, but he remembered the NARCO name and logo, an Indian and an arrowhead. He clarified his identification of NARCO products by explaining that he did not remember the "NARCO" name until he heard it that morning while Curtis Jones testified.

Curtis Jones worked thirty-two years for U.S. Steel, and during part of that time, he worked with Easter in the same department. Jones testified that during this period, he worked around asbestos-containing products all of the time, including two NARCO products: NARCO Lite and NARCO Crete. He was able to identify them as NARCO's because he was familiar with their logo. He testified that both he and Easter were exposed to the dust created from the mixing of these products. Jones went on to explain the process by which the NARCO products were used at the U.S. Steel facility and how both he and Easter were exposed.

The evidence of exposure and product identification presented by third-party witnesses is similar to that presented in *Celotex Corp. v. Tate*, 797 S.W.2d 197 (Tex.App.—Corpus Christi 1990, writ dism'd by agr.).

In *Tate*, the plaintiffs claimed the decedent had breathed asbestos fibers while pouring and mixing raw asbestos and while performing electrical work in a wallboard and plaster plant. *Id.* at 200. A research and product development manager who ran the plant testified that several companies, including the defendant's predecessor, supplied raw asbestos to the plant while the decedent worked there. *Id.* at 204–205. A former plant employee also testified that he recalled the manufacturer's name on bags of raw asbestos supplied to the plant. *Id.* at 205. Although there was nothing to indicate that the decedent had positively identified the manufacturer's product and no direct eyewitness testimony that the decedent worked in the presence of the asbestos-containing product or breathed dust from the product, we rejected the manufacturer's legal and factual sufficiency arguments regarding causation. *Id.* The testimony from third parties, we held, "was strong circumstantial evidence upon which the jury could properly rely to find that Tate was exposed to Philip Carey asbestos." *Id.*

In the present case, there is direct eyewitness testimony that both Moss and Easter worked in the presence of the asbestos-containing product or breathed dust from the product. This direct evidence of exposure surpasses the circumstantial evidence found in *Tate*. Thus, we conclude the evidence was legally and factually sufficient to demonstrate that Moss and Easter were exposed to dust from NARCO's asbestos-containing products.

Relative to its first issue, NARCO also contends that plaintiffs adduced no evidence that its asbestos products contain or emit dangerous levels of asbestos.

The medical evidence confirmed that inhaling asbestos dust, even with relatively light exposure, can produce asbestos-related diseases. It further showed that each exposure to asbestos over a period of time, regardless of the degree or concentration, increases the probability that a person will get an asbestos-related disease. Two of plaintiff's medical experts, Dr. Arnold Brody and Dr. David Egilman, testified that there is no safe level

of asbestos exposure. Here, the evidence showed that NARCO's asbestos products contained anywhere from one to ten percent asbestos that was uniformly distributed throughout the product.

In finding sufficient evidence of exposure in an asbestos case, the Alabama Supreme Court in *Sheffield v. Owens–Corning Fiberglass Corp.*, 595 So.2d 443, 456 (Ala.1992), recognized that "[e]xposure to asbestos for as little as one day can significantly contribute to, cause, and/or aggravate asbestos-related lung diseases. The injurious effect of ingesting asbestos fibers into the lungs is cumulative." The *Sheffield* court went on to state that whether exposure to asbestos fibers from a particular source constitutes a "substantial factor" in producing a plaintiff's injury is a question for the jury. *Id.*(citing *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1094 (5th Cir.1973)).

There was also evidence that NARCO's asbestos-containing products emitted dust and released respirable asbestos fibers, when they were mixed, sprayed, or torn out for replacement. Dr. Richard Landy, former research director for NARCO from 1970 to 1988 and witness at trial, admitted that NARCO's asbestos-containing refractory products produced dust before the dry materials were mixed with water. The jury heard medical evidence indicating that asbestos fibers are inhaled because they become airborne. Dr. Brody testified that "the stuff continuously gets pushed up into the air and we can breathe it." He added that, "when you're in a dusty setting, and there is asbestos in that setting, ... there are millions of fibers that you cannot see that are easily inhaled into the recesses of the lung...." The tendency of asbestos dust and fibers to drift for considerable distances creating a secondary exposure hazard to bystanders and others not working directly with the material has been generally recognized. *Sheffield*, 595 So.2d at 455 (citing *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1381 (11th Cir. 1990)).

We find the evidence sufficient to show that the dust released from NARCO's asbestos-containing products contained and emitted dangerous levels of asbestos.

■ In a final point to its first issue, NARCO claims that there is no evidence showing that plaintiffs frequently and regularly worked in proximity to any NARCO asbestos product. Appellant urges us to adopt the *Lohrmann* test which states, "To support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of exposure to a specific product on a regular basis over some extended period of time actually worked." *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162–63 (4th Cir.1986). This test, frequently called the "frequency, regularity, and proximity test," was applied in Texas law by the Fifth Circuit as the minimum showing of the producing cause in asbestos cases. *Slaughter v. Southern Talc Co.*, 949 F.2d 167, 171 (5th Cir.1991).

We decline to analyze the facts of this case under this standard for two reasons. First, the *Lohrmann* standard has not been adopted by this Court or any other Texas courts. *See Click v. Owens–Corning Fiberglass Corp.*, 899 S.W.2d 376 (Tex.App.—Houston. [14th Dist.] 1995, no writ) (reviewed the *Lohrmann* standard but did not adopt it); *Keene Corp. v. Gardner*, 837 S.W.2d 224 (Tex.App.—Dallas 1992, writ denied) (applies the *Lohrmann* standard to the facts of case but declines to adopt it). Alabama, whose substantive law is applicable to this case, has not adopted the *Lohrmann* test. Second, as appellees point out, the standard is inapplicable to this case because it is used to determine causation in cases where the plaintiffs exposure is based on circumstantial evidence. As we discussed above, Moss and Easter provided direct evidence of exposure to NARCO's asbestos products by the testimony of third-party witnesses and by Easter himself. Further, Roberts offered direct testimony of his exposure to NARCO Lite, an asbestos-containing product.

Accordingly, we hold the evidence legally and factually sufficient to establish that NARCO's asbestos-containing products were a substantial factor in producing appellees' injuries. Appellant's first issue is overruled.

ACTUAL DAMAGES SUFFICIENCY
OF THE EVIDENCE

In its second issue, appellant challenges the sufficiency of the evidence supporting the

**912**

compensatory damage awards to Moss, Easter, their spouses, and Roberts. Appellant contends that the compensatory damage awards totaling $7,000,000 were excessive.

The jury awarded Easter and Roberts $1,250,000 and $1,000,000 respectively for damages which included (1) past loss of earning capacity, (2) past and future physical pain, mental anguish, and physical impairment, and (3) future medical expenses. Moss was awarded $3,000,000 for physical pain, mental anguish, and physical impairment in addition to $1,500,000 in punitive damages. Moss' and Easter's spouses received $1,000,-000 and $750,000 respectively for loss of consortium.

■■■ When the elements of damages considered by the jury include the more amorphous, discretionary damages, such as mental anguish, pain and suffering, physical impairment, and disfigurement, any amount awarded above the more definitive past medical expenses and lost wages will be left to the discretion of the jury. *Dico Tire, Inc. v. Cisneros,* 953 S.W.2d 776, 791–92 (Tex. App.—Corpus Christi 1997, writ denied). *See Texarkana Memorial Hosp., Inc. v. Murdock,* 946 S.W.2d 836, 841 (Tex.1998) (medical expenses are unlike the more nebulous damages such as pain and suffering where the jury has broad discretion when fixing an amount to award). The determination of the amount of money that will compensate the plaintiff for physical injuries, impairment, and mental anguish involves a consideration of elements for which no mathematical standard exists except what an honest or impartial jury may deem adequate. *Dico Tire,* 953 S.W.2d at 792. Unless the award is so large as to indicate that it was influenced by passion, prejudice, or other improper motive, the jury verdict will not be set aside. *Id.* Therefore, the question of damages, if not excessive, is properly left for the jury to determine. *Martin,* 942 S.W.2d at 719. We are mindful that a jury's discretion in compensation for mental anguish is limited to that which causes a "substantial disruption in the plaintiffs daily routine, or a high degree of mental pain and distress." *Saenz v. Fidelity & Guar. Ins.,* 925 S.W.2d 607, 614 (Tex.1996).

■■■ The standard of review for an excessive damages complaint is factual sufficiency of the evidence. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.1998); *Pope v. Moore,* 711 S.W.2d 622, 624 (Tex. 1986). The court of appeals should employ the same test for determining excessive damages as for any factual sufficiency question. *Pope,* 711 S.W.2d at 624.

■■■ At the time of trial, Roberts was sixty-two years old. In November 1994, he was diagnosed with asbestosis and asbestos-related pleural disease by Dr. Brian Forrester. Roberts testified that he had been active all of his life but no longer had the endurance he once had and becomes exhausted easily. He claims this loss of stamina and his increased difficulty in breathing has affected his ability to do certain work and participate in activities that he once enjoyed. Roberts stated he is concerned about getting cancer and does not want to become dependent on others for assistance.

Dr. Forrester, Roberts' medical expert, explained how Roberts, who had smoked at least a pack of cigarettes a day for most of his life in addition to his asbestos exposure, had an increased risk of dying of lung cancer than someone who did not smoke and was never exposed to asbestos. According to Dr. Forrester, there were signs that Roberts' disease had progressed and would continue to do so, and "as best as we can predict," Roberts would die from an asbestos-related injury. In reference to future medical expenses, he testified that Roberts could incur medical bills in a range between $300,000 to $400,000.

NARCO contends the damage award is excessive because Roberts presented no evidence of past damages or a reasonable probability that he would incur future damages. NARCO points to the fact that at the time of trial in 1997, Roberts had not seen a doctor since his examination by Dr. Forrester in 1994, and further, that he was still working part-time as a building inspector.

We review the evidence, keeping in mind that it is the jury's role, not ours, to judge the credibility of the evidence, to assign the weight to be given to testimony, and to re-

solve inconsistencies within or conflicts among the witnesses' testimony. *Hoechst Celanese Corp. v. Arthur Bros., Inc.,* 882 S.W.2d 917, 925 (Tex.App.—Corpus Christi 1994, writ denied). As the trier of fact, the jury may choose to believe all, part, or none of the testimony of any one witness. *Silva v. Enz,* 853 S.W.2d 815, 817 (Tex.App.—Corpus Christi 1993, writ denied). In this case, the jury apparently chose to believe that Roberts' had suffered past physical impairment, pain, and mental anguish and that there was a reasonable probability that he would suffer the same in the future in addition to future medical expenses. To sustain appellant's factual insufficiency challenge, we would have to conclude that the evidence supporting the finding is so weak as to indicate it is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). Because NARCO has not met this burden, we overrule its sufficiency challenge as to Roberts.

 In Easter's case, he was eighty years old when he testified at trial. He had been diagnosed with mesothelioma and asbestosis. Whether he actually had mesothelioma was disputed at trial. He explained how it was hard to describe his feelings once he found out that mesothelioma was a fatal cancer: "I realized that I had … a death sentence staring me in the face and that really concerned me because of my wife." Easter testified that he experiences a dull pain everyday and feels that the pain, in addition to his shortness of breath, is progressively getting worse.

Dr. James Robb, a pathologist, reviewed Easter's medical background as well as Moss'. Based on his study of Easter's records, he expressed no doubt that Easter was suffering from mesothelioma. Although patients with this cancer often live for less than one year after diagnosis, Dr. Robb testified that he has seen people live only three months after diagnosis or as long as nine and one-half years. The doctor explained in detail how the cancer grows causing the patient to suffer from increased pain as the nerves are invaded by the cancer. Dr. Robb testified that In the vast majority of cases, the patient slowly suffocates to death because the cancer encases the lungs and heart.

Overall, the jury heard testimony from plaintiffs' medical experts with regard to the painful death and suffering associated with mesothelioma. According to Dr. Robb, Easter could be faced with future medical expenses in the range of $150,000 to $300,000.

Dr. Kathryn Hale, NARCO's medical expert who also examined Easter, contradicted Dr. Robb's mesothelioma diagnosis. She believed that Easter did not have this cancer because he was still alive and she could not detect any changes from x-rays taken in 1994 to others taken in 1996. She also opined that certain findings on a previous CAT scan done on Easter revealed a different type of asbestos-related condition rather than mesothelioma. Dr. Hale determined that Easter's life expectancy would be much more limited by his serious heart problems than by any asbestos-related condition.

Again, we note it is the jury's role to judge the credibility of evidence and resolve inconsistencies in testimony. We find the evidence factually sufficient to support Easter's damage award.

 With regard to the $750,000 loss of consortium award to Easter's wife, the jury heard Mr. Easter testify about their marriage of fifty-seven years. He explained how his wife is subject to strokes and afflicted with asthma, emphysema, and osteoporosis. Aside from the nurse's visits to assist in administering medication and helping Mrs. Easter with her bath, Easter testified that he does all of the housework and cooking.

We give no credit to NARCO's argument that Mrs. Easter's short life expectancy based on her health will diminish her future loss of consortium. Although there was evidence that Mrs. Easter was in poor health, NARCO produced no evidence as to how much longer she was actually expected to live. The loss of consortium award was not excessive.

 Moss was diagnosed with mesothelioma in November 1994 after undergoing a thoracotomy, an invasive surgery performed to diagnose the disease. This operation disfigured his chest because of the significant scar and loss of muscle tissue. As a result of the cancer, he died four and one-half months

after being diagnosed and ten months after he noticed the initial symptoms of his illness.[3] Just weeks before he died, he testified by deposition from the hospital where he was undergoing radiation therapy. By his testimony, the jury heard how the radiation therapy left him feeling "totally exhausted." Easter stated that he suffered from a dull pain and extreme shortness of breath, was very weak, and completely helpless. Before his illness, Moss discussed the various activities that he had participated in since his retirement in 1988. He and his wife belonged to various botanical societies, they did a lot of traveling, they performed volunteer work for disaster relief programs, their church, and community programs. The evidence showed that Moss endured a great amount of physical pain, impairment, and mental anguish prior to his death.

■■■■ Mrs. Moss' loss of consortium award was based on Alabama law permitting a decedent's spouse to recover for the loss of consortium that the surviving spouse suffered between the decedent's injury and death. *Zimmerman v. Lloyd Noland Found.*, 582 So.2d 548, 551 (Ala.1991). The jury heard evidence of the very close relationship Mrs. Moss shared with her husband. Before Moss died, the family had begun plans for their 50th wedding anniversary. Mrs. Moss testified about her husbands hospital stay and the feelings of watching his condition worsen on a daily basis. She testified that the stress of her husbands hospitalization caused her weight to drop to 95 pounds and caused her to develop Crone's disease resulting in stomach and colon complications.

The evidence in this case was legally and factually sufficient to support the loss of consortium award to Mrs. Easter and all the other plaintiffs. The damages awarded in this case were not so large as to indicate that the jury was improperly influenced by passion or sympathy. Furthermore, the different amounts awarded to each plaintiff indicate that the jury considered the various factors applicable to each plaintiff's cause of action.

Appellant's second issue is overruled.

### ADMISSION AND EXCLUSION OF EVIDENCE

By its third issue, appellant argues the trial court committed reversible evidentiary errors in three instances by (1) allowing Dr. Jack Hasson to testify as an expert witness; (2) refusing to admit a medical report indicating that Easter did not have an asbestos-related injury; and (3) refusing to admit a medical report indicating that Roberts only had mild asbestosis.

■■■■ The admission or exclusion of evidence is a matter within the trial court's sound discretion. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex.1995). A trial court abuses its discretion when it rules "without regard for any guiding rules or principles." *Id.* at 754. An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. *See State Bar of Texas v. Evans*, 774 S.W.2d 656, 658 n. 5 (Tex.1989). To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show that the trial court's ruling was in error and that the error probably caused the rendition of an improper judgment. Tex.R.App. P. 44.1(a); *McCraw v. Maris*, 828 S.W.2d 756, 757 (Tex.1992). When the issue is exclusion of evidence, the reviewing court must review the entire record to determine if error occurred. *McCraw*, 828 S.W.2d at 758.

■■■■ In its first evidentiary complaint, NARCO contends that the trial court committed reversible error by failing to exclude the videotaped deposition testimony of Dr. Jack Hasson, one of Moss' treating physicians. NARCO claims that Dr. Hasson was improperly allowed to testify as an expert witness in violation of Texas Rule of Civil Procedure 215.5 because he had only been designated in discovery requests as a fact witness.

---

3. Moss' compensatory damages were based on his survival cause of action, not wrongful death. Alabama law permits "survival" damages for the decedent's estate if the decedent had a suit pending at the time of death. *See King v. National Spa and Pool Inst.*, 607 So.2d 1241, 1246 (Ala. 1992).

In his answers to discovery requests, Moss identified the doctor as a witness with knowledge of facts relevant to the suit because he had treated Moss and initially diagnosed his illness. Thereafter, Moss supplemented his discovery answers regarding expert witnesses with the designation of "[a]ny physician who has examined and/or treated Plaintiff [Moss]." NARCO argues that the use of this "catch-all" phrase was insufficient to identify Dr. Hasson as a testifying expert witness under this Courts holding in *American Cyanamid Co. v. Frankson,* 732 S.W.2d 648 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.).

In *Frankson,* the trial court ordered all defendants to produce for deposition all experts whom they intended to rely upon at trial. One of the defendants, without specifically designating any witnesses, answered that it reserved the right to call all experts that were designated as witnesses by other defendants in the case. *Id.* at 655. The trial court did not allow the witnesses to testify. On appeal, we disallowed any catch-all phrase that allows a party to designate as witnesses those witnesses that have been properly designated by other parties. *Id.*

By contrast, Moss' identification of Dr. Hasson as an expert witness does not rely on another party's witness designation. Rather, it identified as an expert any physician who had previously examined or treated Moss. The list of these four physicians includes Dr. Hasson and was provided by Moss as an exhibit to a previous discovery request.

The purpose behind civil procedure rules 166b and 215.5 is to encourage full discovery of the issues and facts prior to trial so that parties can make realistic assessments of their respective positions. The intent is to facilitate settlements and prevent trials by ambush. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 395 (Tex.1989). We hold that Moss' expert witness designation satisfied the purposes of discovery and was sufficient to apprise NARCO of Dr. Hasson's identity. No abuse of discretion is shown by the trial court's action.

■ Even if the admission of the doctor's testimony were considered error, there is no evidence to show the error "probably caused the rendition of an improper judgment." *See* TEX.R.APP. P. 44.1(a). NARCO complains that Dr. Hasson provided the *only* expert medical evidence about progression of the disease, the medical steps taken for diagnosis, and the course of medical treatment. Our review of the record indicates there was a great deal of testimony from plaintiff's medical experts explaining what mesothelioma is, how it is diagnosed, and how it kills quickly because it is an incurable cancer.

■ With regard to Easter's case, NARCO complains of the trial courts refusal (1) to allow its medical expert, Dr. Kathryn Hale, to explain that her opinion was based in part on a report prepared by Dr. Philip Cagle, and (2) to admit Dr. Cagle's report into evidence.

After examining Easter on NARCO's behalf and reviewing his past medical records, Dr. Hale opined that he did not suffer from an asbestos-related injury; neither mesothelioma nor asbestosis. In making her determination, she relied on Dr. Cagle's pathology report. Dr. Cagle reviewed tissue samples taken from Easter and reported the amount of tissue available was "insufficient to render a definitive diagnosis of malignancy."

Before Dr. Hale testified, the court addressed the independent admissibility of Dr. Cagle's report as well as the extent to which she could discuss the report as a basis for her opinion. Easter objected to Dr. Hale's ability to discuss the Cagle report because it had not been shown to be a medical record and constituted inadmissible hearsay. Easter also raised a rule 403 objection stating the risk of prejudice outweighed the reports probative value. NARCO responded that Dr. Hale relied on this report in order to form her opinion and therefore should be allowed to discuss it. The trial court ruled the report inadmissible.

While testifying, Dr. Hale was asked by NARCO's counsel, "Are their [sic] other things that you looked at in determining that he [Easter] did not have mesothelioma?" Dr. Hale answered, "I had a — a pathology report from Dr. Kaygo [sic], he said couldn't tell what it was." At this point, appellee's counsel asked to approach the bench and a

discussion was held off the record. When testimony resumed, the court instructed the jury to disregard the witness's last remark.

At the time of trial, Texas Rule of Civil Evidence 705 read:

> The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event disclose on direct examination, or be required to disclose on cross-examination, the underlying facts or data.

TEX.R. CIV. EVID. 705.[4] The use of the permissive word "may" in rule 705 does not indicate an absolute right of the expert to disclose all of the facts and underlying data under all circumstances. *Kramer v. Lewisville Mem'l*, 831 S.W.2d 46, 49 (Tex.App.—Forth Worth 1992), *aff'd. on other grounds*, 858 S.W.2d 397 (Tex.1993) (citing *Beavers v. Northrop Worldwide Aircraft*, 821 S.W.2d 669, 674 (Tex.App.—Amarillo 1991, writ denied)). Rule 403 gives the trial court discretion to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. TEX.R. CIV. EVID. 403.

We note that NARCO could have requested, in the discussion of Dr. Cagle's report, a limiting instruction under evidence rule 105(a) which requires the trial court, upon timely request, to restrict the evidence to its proper scope and to instruct the jury accordingly. TEX.R. CIV. EVID 105(a). No such request was made.

The trial court had a legitimate basis for its ruling, and therefore, we cannot say the trial judge abused his discretion in excluding Dr. Hale's discussion of the Cagle report or the report itself.[5] Further, Dr. Cagle's statement that the amount of tissue was insufficient for diagnosis does not lead us to believe the admission of this report would have resulted in a different judgment.

 Appellant's third evidentiary complaint is that the trial court erred in excluding the medical report of Dr. James Ballard. Dr. Ballard was retained by Roberts to form an opinion as to the presence of his asbestosis. Dr. Ballard concluded in his report that asbestosis was present at a level of 1/0. NARCO's expert, Dr. Hale testified that asbestosis at a level of 1/0 is a very mild form of asbestosis and is therefore unlikely to progress.

NARCO contends that this report, excluded as hearsay, constitutes a non-hearsay admission of a party-opponent because it was performed at Robert's request and was attached as a medical record in one of his discovery responses.

We conclude that the error, if any, in excluding this evidence was not reversible error. *See* TEX.R.APP. P. 44.1. NARCO contends the error probably caused the rendition of an improper judgment because the report showed that Roberts had only a "1/0 profusion" on his x-ray. According to NARCO, this evidence, taken in conjunction with Dr. Hale's testimony that a 1/0 profusion signified *mild* asbestosis, would have decreased the jury's damage award to Roberts. We disagree. Regardless of the severity of Roberts' asbestosis, the jury heard conflicting evidence from both sides as to whether the disease was likely to progress. As such, the jury was able to reach their own conclusion about the credibility of each side's testimony. Furthermore, the damage award, based on several factors as discussed above, is left to the discretion of the jury.

Appellant's third issue is overruled.

## CONSOLIDATION

In its fourth issue, NARCO contends the trial court abused its discretion by consolidating the Roberts case with the Easter and Moss cases because the cases lacked common factors and the consolidation was unfair and prejudiced NARCO.

 A trial court has broad discretion in matters of consolidation and severance, and a trial court's actions on such matters

---

4. At the time of trial, the Texas Rules of Evidence were still distinguished as civil or criminal. All cites to the rules will use this distinction, unless noted otherwise.

5. In discovery, NARCO listed Dr. Cagle as a witness, but he was not called at trial.

will not be disturbed absent a showing of abuse of discretion. *See Excel Corp. v. Valdez,* 921 S.W.2d 444, 448 (Tex.App.—Corpus Christi 1996, orig. proceeding); *Lone Star Ford, Inc. v. McCormick,* 838 S.W.2d 734, 737 (Tex.App.—Houston [1st Dist.] 1992, writ denied). Rule 174(a) of the Texas Rules of Civil Procedure governs the consolidation of cases. It provides:

> *Consolidation.* When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

TEX.R. CIV. P. 174(a). The rule allows for consolidation of cases when there are common questions of law or fact. However, if "all of the facts and circumstances of the case unquestionably require a separate trial to prevent manifest injustice, and there is no fact or circumstance supporting or tending to support a contrary conclusion," the trial court does not have any discretion to order consolidation. *See Womack v. Berry,* 156 Tex. 44, 291 S.W.2d 677, 683 (1956). In deciding whether to consolidate, the trial court must balance the judicial economy and convenience that may be gained by the consolidation against the risk of an unfair outcome because of prejudice or jury confusion. *Owens–Corning Fiberglas Corp. v. Martin,* 942 S.W.2d 712, 716 (Tex.App.—Dallas 1997, no writ) (citing *Dal–Briar Corp. v. Baskette,* 833 S.W.2d 612, 615 (Tex.App.—El Paso 1992, orig. proceeding)).

Recently, the Texas Supreme Court considered the requirements for consolidation as they relate to asbestos products cases. *See In re Ethyl Corp.,* 975 S.W.2d 606 (Tex.1998) (orig.proceeding). The court explained that due to the considerable experience Texas trial courts have gained in "managing the thousands of claims asserted in asbestos litigation ... it is possible to try more than one asbestos-related claim in a single trial." *Id.* at 610, 611.

In its opinion, the court adopts the following nine factors which are designed to assist courts in determining if the consolidation of claims is likely to prejudice or confuse the jury: (1) common work site; (2) similar occupation; (3) similar time of exposure; (4) type of disease; (5) whether plaintiffs were living or deceased; (6) status of discovery; (7) whether all plaintiffs were represented by the same counsel; (8) type of cancer alleged; and (9) the type of asbestos-containing product to which the worker was exposed.[6] *Id.* at 615. *See Martin,* 942 S.W.2d at 712 (applying the Maryland factors and affirming the consolidation of claims from twelve workers exposed to asbestos). Because the record in *Ethyl* was silent with regard to many of these factors, the court refused to issue a writ of mandamus prohibiting the trial court from consolidating the premises liability claims of twenty-two workers and their families against five defendants. *Ethyl,* 975 S.W.2d at 617.

■■ We address each of these factors as they relate to the facts of this case.

*1. Work site*

There was not a common work site among all three plaintiffs. Moss worked the majority of his career for the Alabama Power Company at seven different sites. Easter worked for U.S. Steel his entire career at two different work sites and Roberts worked for the Tennessee Valley Authority at one work site. All of the work sites were located in Alabama.

Appellant, however, is only challenging the consolidation of the Roberts case with the Moss and Easter cases. The addition of one work site does not pose a risk of jury confusion or prejudice against NARCO. Furthermore, as the Dallas Court of Appeals explained in *Martin,* the policy be-

---

6. The first eight, identified as the Maryland factors, were first set forth in an unpublished federal district court decision, *In re All Asbestos Cases Pending in the United States District Court for the District of Maryland,* LEXIS 10719, at *3 (D.Md. Dec. 16, 1983) (en banc). Thereafter, they were adopted by the Second Circuit in *Malcolm v. National Gypsum Co.,* 995 F.2d 346, 350–351 (2nd Cir.1993), and applied in *Owens–Corning Fiberglas Corp. v. Martin,* 942 S.W.2d 712 (Tex. App.—Dallas 1997, no writ). The ninth factor is adopted in *Ethyl.*

hind consolidating cases involving shared work sites is to simplify the proof of product identification. *Martin*, 942 S.W.2d at 717. Because Owens–Corning was the sole defendant in that case, as NARCO is in this case, proof of product identification and market share liability was not in issue, thereby minimizing the importance of common work sites. We conclude that this factor does not weigh against consolidation.

## 2. & 3. Similar Occupation, Times of Exposure

Roberts worked as a boilermaker between 1968 and 1977. Easter worked as an engineer for U.S. Steel from 1941 to 1971, and Moss also worked as an engineer for the Alabama Power Company from 1946 to 1951 and again from 1953 to 1978. Roberts' occupation was similar only to the extent that he was exposed to asbestos in a bystander capacity as were Moss and Easter. This similarity is nevertheless significant and supports consolidation because each of the men were exposed in the same manner and evidence of exposure as a bystander would be relevant in each case. The extent of Roberts' exposure is about one-third less than Moss or Easter, but the periods of exposure overlap, decreasing the likelihood of prejudice to NARCO, particularly concerning "state-of-the-art" evidence. Accordingly, these two factors do not clearly weigh against consolidation.

## 4. & 8. Disease and Type of Cancer

Of the different asbestos-related diseases, Moss alleged mesothelioma, Easter alleged mesothelioma and asbestosis, and Roberts alleged asbestosis and asbestos-related pleural disease. Thus, the Roberts consolidation only required additional evidence of pleural disease. The different type of cancer is not an applicable factor to this case because Roberts did not suffer from a cancer. These two factors do not weigh against consolidation.

## 5. Living or Deceased

Because Moss died before trial and before Roberts' case was consolidated, this factor does weigh against consolidation. The supreme court noted in *Ethyl* that there is a concern that permitting the consolidation of claims by living workers with claims of the deceased's family will unduly prejudice the trial because there is a danger that the claims of the deceased workers will bootstrap the claims of workers who do not have fatal conditions. *Ethyl*, 975 S.W.2d at 616. The dead plaintiffs may present the jury with a powerful demonstration of the fate that awaits those claimants who are still living. *Id.* (citing *Malcolm v. National Gypsum Co.*, 995 F.2d 346, 351–52 (2nd Cir. 1993)). Nevertheless, NARCO does not object to the consolidation of Easter's case, even though Easter was still alive. It appears that the prejudicial effect, if any, of Moss' death would have had the same effect on the jury if Easter had remained as the only other plaintiff. While we find that this factor weighs against the consolidation of Roberts' case, we do not consider it so prejudicial as to amount to an abuse of discretion.

## 6. & 7. Discovery Status, Counsel

These factors weigh in favor of consolidation because appellees were represented by the same counsel and all the cases were ready for trial.

## 9. The Type of Asbestos–Containing Product

All three appellees were exposed to NARCO products and all three were exposed to NARCO Lite. Moss was also exposed to NARCO Aerogun. This factor favors consolidation.

After analyzing all of the facts and circumstances of the case under the factors adopted by the supreme court in *Ethyl*, we hold the trial courts consolidation was proper and did not result in a manifest injustice to NARCO. The judicial economy and convenience of trying Roberts' case with the others outweighed the risk of prejudice or jury confusion.

Appellant's fourth issue is overruled.

## PUNITIVE DAMAGES

By its fifth issue, NARCO argues the punitive damage award of $1.5 million to Moss' estate representatives is unconstitutionally excessive under the guidelines established in *BMW of N. Am. v. Gore*, 517 U.S. 559, 116

S.Ct. 1589, 134 L.Ed.2d 809 (1996).[7] It also contends the damage award was not supported by legally or factually sufficient evidence.

### A. Constitutional Due Process

"The Due Process Clause of the Fourteenth Amendment prohibits a State from imposing a grossly excessive punishment on a tortfeasor." *BMW*, 517 U.S. at 562, 116 S.Ct. 1589. To determine whether the punitive damages awarded in this case were excessive, we apply the three ""guideposts established by the Supreme Court in *BMW*: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between actual and punitive damages; and (3) a comparison of the punitive damages awarded and other civil or criminal penalties that could be imposed for similar misconduct. *BMW*, 517 U.S. at 574–75, 116 S.Ct. 1589. *See Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 45 (Tex.1998) (upholding punitive damage award of $3.7 million against asbestos manufacturer under the *BMW* standards).

Analyzing under the first standard, the Supreme Court stated that the degree of reprehensibility is "[p]erhaps the most important indicium of the reasonableness of a punitive damage award." *Id.* at 575, 116 S.Ct. 1589. In this case, the evidence suggests that the amount of damages was justified. Contrary to the economic harm suffered by the purchaser of the automobile in *BMW*, NARCO's conduct endangered the health and safety of at least three individuals, Moss specifically.

The evidence showed that in 1964, a company named Eagle Pitcher began putting caution labels on its own products which contained asbestos. This company supplied the same products for NARCO but rebranded the product with the NARCO label. Eagle Pitcher contacted NARCO to find out if NARCO also wanted the caution label placed on the products sold under the NARCO label. No caution or warning was ever used. Johns–Manville, a company who supplied raw asbestos to NARCO, also began using a caution label on its products. However, once NARCO mixed the raw asbestos with other materials to make its own product, no caution or warning was ever used.

For a period spanning two decades, the 1960's and 70's, NARCO manufactured and sold asbestos-containing products without any type of warning or cautionary label and without any label indicating the product contained asbestos. This is true despite the fact that the dangers of asbestos became well-known and the subject of OSHA and EPA regulations. After NARCO became aware of the dangers of asbestos, it continued to market its asbestos-containing products because it believed that its products were safe and did not come under the purview of the federal regulations. Further, it never tested its products to determine if they were harmful. We find the punitive damages assessed against NARCO do not offend constitutional due process guarantees under *BMW*'s first standard.

Next, we review the punitive damages to determine if they bear a "reasonable relationship" to the compensatory damages awarded to Moss. In Moss' case, the $3 million in compensatory damages was awarded under Alabama's survival statute, *see* ALA. CODE § 6–5–462 (1975); *King v. National Spa & Pool Inst.*, 607 So.2d 1241, 1246 (Ala.1992), while the punitive damages were awarded under the wrongful death statute. ALA.CODE § 6–5–410 (1975). Because Alabama's wrongful death statute does not authorize compensatory damages, *Cherokee Elec. Coop. v. Cochran*, 706 So.2d 1188,1193 (Ala.1997), we compare the punitive damages to the compensatory damage award under the survival statute. *See Malone*, 972 S.W.2d at 46.

After reducing the compensatory and punitive damages to reflect settlement credits, the trial court's final judgment awarded Moss' estate representatives $2.8 million in compensatory damages and $1.3 million in punitive damages. This results in a ratio of .46 to 1. This ratio is within constitutional

---

7. At issue in *BMW* was a $2 million punitive damage award to a purchaser of a new BMW automobile who suffered $4000 in economic damages when BMW failed to disclose that the car had been repainted prior to his purchase.

limits and is not "grossly excessive" under the second *BMW* standard. *See BMW,* 517 U.S. at 582, 116 S.Ct. 1589 (ratio of 500 to 1 is grossly excessive and transcends the constitutional limits); *TXO Prod. Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 462, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (indicating that a 10 to 1 ratio would not be unconstitutional); *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 20–21, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1990) (holding that a ratio of 4 to 1 did not "cross the line into constitutional impropriety"); *Malone,* 972 S.W.2d at 46 (ratios of 2.85, 2.0, 1.5, and .8 to 1 were all within constitutional limits).

The third standard under BMW requires a comparison of the punitive damages to other civil or criminal penalties that could be imposed for comparable misconduct. As the supreme court explained in *Malone* though, the nature of a wrongful death case does not lend itself to a comparison with statutory penalties. *Malone,* 972 S.W.2d at 47 (citing *Continental Trend Resources, Inc., v. OXY USA, Inc.,* 101 F.3d 634, 640–41 (10th Cir. 1996)). Instead, the question under the third standard becomes whether NARCO had reasonable notice that its failure to provide warnings about the dangers of its asbestos-containing products could result in substantial punishment in the form of punitive damages. *See id.* To this question, NARCO claims "there is no evidence that NARCO actually knew about the dangers of asbestos before it began manufacturing its product." Even accepting this as true, there was evidence to indicate that NARCO did have this notice beginning in the mid–1960s. Nevertheless, it continued to manufacture at least one asbestos-containing product until the late 1970s.

Having applied the three guideposts established in BMW, we hold the punitive damage award did not violate appellant's due process rights.

*B. Sufficiency of the Evidence*

■ To sustain the punitive damage award, the record must contain legally suffi-

cient evidence of NARCO's negligence.[8] In light of our disposition on NARCO's first issue, we find the evidence is legally sufficient and now determine whether the evidence is factually sufficient to support the award.

In *Transportation Insurance Company v. Moriel,* 879 S.W.2d 10, 31 (Tex.1994), the supreme court held "that the court of appeals, when conducting a factual sufficiency review of a punitive damages award, must hereafter detail the relevant evidence in its opinion, explaining why that evidence either supports or does not support the punitive damages award in light of the *Kraus* factors." *Moriel,* 879 S.W.2d at 31. *See Ellis County State Bank v. Keever,* 915 S.W.2d 478, 479 (Tex.1995) (remanding to the court of appeals to detail all the evidence instead of just the evidence supporting the punitive damages award).

The *Kraus* factors, identified by the supreme court in *Alamo National Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981), are: (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety.

The nature of the wrong in Moss' case is his death and the physical and economic harm he suffered as a result of being exposed to asbestos. Moss died after he contracted mesothelioma, a terminal cancer of the chest wall. Before he died, Moss endured severe pain and discomfort during his extended hospitalization where he underwent radiation treatment. Less than a year passed from the first symptoms of his illness to his death. There was evidence from both sides in this case about the deadly nature of the disease. It was also undisputed that asbestos exposure is one of the only known causes of mesothelioma.

Other than NARCO's witness, Dr. Landy, who testified he doesn't think asbestos

---

8. Alabama law authorizes punitive damages in a wrongful death case based on a finding of mere negligence, but does not authorize compensatory damages. *Cherokee Elec. Coop. v. Cochran,* 706

So.2d 1188,1193 (Ala.1997) (citing *Louis Pizitz Dry Goods Co. v. Yeldell,* 274 U.S. 112, 47 S.Ct. 509, 71 L.Ed. 952 (1927)).

causes cancer, it was undisputed that Moss' mesothelioma was caused by asbestos exposure. NARCO agrees that some of its products contained asbestos and that Moss died from a cancer, but it disagrees that its products were the proximate cause of Moss' cancer. NARCO's evidence on this point has already been discussed in its first issue.

The character of the conduct involved and the degree of the wrongdoer's culpability refer to evidence of NARCO's state of mind, the degree of its conscious indifference, and any malice in its actions. *Ellis County State Bank v. Keever*, 936 S.W.2d 683, 687 (Tex. App.—Dallas 1996, no writ).

In support of its argument on this issue, NARCO points to question six of the jury charge which shows that the jury in this case failed to find that it acted recklessly or with a conscious disregard for the rights and safety of Moss. However, in question ten the jury awarded punitive damages to Moss after receiving the following instruction:

> For purposes of this question, you are instructed that punitive damages are imposed in this type of action for the preservation of human life and as a deterrent to others to prevent similar wrongs. The amount of damages should be directly related to the amount of wrongdoing of [sic] the part of the defendant. In assessing damages you are not to consider the monetary value of the life of the decedent, for damages in this type of action are not recoverable to compensate the family of the deceased from a monetary standpoint on account of his death, not to compensate the plaintiff for any financial or pecuniary loss sustained by him or the family of the deceased on account of his death.

In addition to the evidence we discussed under the *BMW* reprehensibility standard, NARCO offered very little evidence to justify its use of asbestos in its products. Dr. Landy testified that as NARCO's director of research, he knew some of the products contained asbestos, but because of the small percentage of raw asbestos in the overall product, it was his opinion that NARCO's products were not harmful. NARCO offered no evidence to show that Dr. Landy's opinion was based on any type of objective evidence.

While discussing the favorable properties of asbestos in its spray-on refractory product Aerogun, Dr. Landy explained that the reason the product was not eliminated from its product line was because customers were "very satisfied with how it gunned. And you have to satisfy your customer." After hearing this, a jury could reasonably conclude that despite NARCO's awareness of the dangers of asbestos, it may have been more concerned with maintaining profits than the health and safety of individuals.

In reference to the situation and sensibilities of the parties concerned, the evidence shows that NARCO was a large company with a variety of products and approximately 4500 employees in 1967. By 1991, that number was reduced to 1500 to 1600 employees. Moss was not a direct user of its products but the nature of his job required him to be around the products as they were being used by other trades. NARCO could have easily placed a caution or warning label on its products, or at the least, identified asbestos as a product ingredient. Reviewing the facts and circumstances of this case, we conclude that NARCO's conduct was substantially offensive to a public sense of justice and propriety.

We affirm the $1.5 million punitive damage award assessed against NARCO and overrule its fifth issue.

### APPORTIONMENT OF SETTLEMENT CREDITS

NARCO's sixth and final issue complains the settlement credits were incorrectly apportioned among Easter and his wife and Moss' estate and Moss' wife. As appellant concedes, the total amount of the judgment for which NARCO is liable will not be affected unless we modify the damage awards in this case, which we have not done.

Thus, we decline to address this issue as it is unnecessary to the final disposition of this appeal. TEX.R.APP. P. 47.1.

Accordingly, we affirm the trial courts judgment.